W4 Farms, Inc. v. Tyson Farms, Inc., 2017 NCBC 62.

STATE OF NORTH CAROLINA

SURRY COUNTY

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
16 CVS 1112

W4 FARMS, INC.; W4 POULTRY
FARMS, LLC; and CHARLES JOEY
WHITE,

               Plaintiffs,

v.

TYSON FARMS, INC. and TYSON
FOODS, INC.,

               Defendants.

**ORDER AND OPINION ON
DEFENDANTS' PARTIAL MOTION
TO DISMISS**

1.    **THIS MATTER** is before the Court on Defendants Tyson Farms, Inc. ("Tyson Farms") and Tyson Foods, Inc.'s ("Tyson Foods") (collectively, the "Defendants") Partial Motion to Dismiss Plaintiffs' Second Amended Complaint (the "Motion"). Having considered the Motion, the briefs, and arguments of counsel at a hearing on the Motion, the Court **GRANTS in part** and **DENIES in part** the Motion.

> *Royster and Royster, PLLC, by Brian A. Royster, and Goldasich & Associates, LLC, by J. Andrew Fulk, Dennis E. Goldasich, and Justin C. Owen, for Plaintiffs.*
>
> *Cranfill Sumner & Hartzog LLP, by F. Marshall Wall and Katherine Barber-Jones, and Shook, Hardy & Bacon, by Mark C. Tatum, for Defendants.*

Robinson, Judge.

# I. INTRODUCTION

2. This action arises out of a contract (the "Broiler Production Contract") between Plaintiffs W4 Farms, Inc. ("W4 Farms"), W4 Poultry Farms, LLC ("W4 Poultry"), and Charles Joey White ("Joey White") (collectively, the "Plaintiffs"), on the one hand, and Defendants, on the other hand, for the production of marketable, target-weight, processible broiler chickens ("Broiler(s)"). Pursuant to the Broiler Production Contract, Plaintiffs incurred significant debt and infrastructure obligations in constructing multiple broiler houses, built to Defendants' specifications, on Plaintiffs' farm. Thereafter, Plaintiffs allege that Defendants knowingly provided Plaintiffs with Broilers that were genetically defective, rendering the Broilers inherently susceptible to disease. Plaintiffs contend that Defendants concealed the Broilers' genetic defect and resulting susceptibility to disease from Plaintiffs. Plaintiffs allege that the defect-induced disease caused Plaintiffs to sustain significant Broiler deaths, which in turn detrimentally impacted their compensation under the Broiler Production Contract and caused Plaintiffs to sustain severe financial losses. Additionally, Plaintiffs contend that Defendants improperly terminated the Broiler Production Contract, thereby exacerbating Plaintiffs' pecuniary losses.

# II. PROCEDURAL HISTORY

3. The Court sets forth here only those portions of the procedural history relevant to its determination of the Motion.

4.      W4 Farms and W4 Poultry filed their Complaint on August 26, 2016 and a First Amended Complaint on October 20, 2016.

5.      This case was designated as a complex business case and assigned to the undersigned by order of the Chief Justice of the Supreme Court of North Carolina dated November 23, 2016.

6.      On February 1, 2017, Plaintiffs filed a motion seeking leave to amend their First Amended Complaint, which the Court granted by order dated March 2, 2017. Plaintiffs filed their Second Amended Complaint on March 13, 2017 that, in part, added Joey White as a party-plaintiff and Tyson Foods as a party-defendant.

7.      On April 10, 2017, Defendants filed the Motion pursuant to Rule 12(b)(6) of the North Carolina Rules of Civil Procedure ("Rule(s)") and their supporting brief.

8.      On June 28, 2017, two days before the hearing on the Motion, Plaintiffs filed a motion for leave to amend their Second Amended Complaint and attached thereto a proposed third amended complaint. During the hearing on the Motion, counsel for Plaintiffs stipulated that the allegations of the proposed third amended complaint do not affect or otherwise cure any alleged defect in the Second Amended Complaint that is the subject of the present Motion.

9.      The Motion has been fully briefed, and the Court held a hearing on the Motion on June 30, 2017. The Motion is now ripe for resolution.

## III. FACTUAL BACKGROUND

10. The Court does not make findings of fact on the Motion under Rule 12(b)(6), but only recites those factual allegations of the Second Amended Complaint that are relevant and necessary to the Court's determination of the Motion.

11. Tyson Farms is a North Carolina corporation and a wholly-owned subsidiary of Tyson Foods, a Delaware corporation. (Second Am. Compl. ¶¶ 4–5.)

12. W4 Farms is a North Carolina corporation with its principal office in Surry County, North Carolina. (Second Am. Compl. ¶ 1.)

13. W4 Poultry is a North Carolina limited liability company with its principal office in Surry County, North Carolina. (Second Am. Compl. ¶ 2.)

14. W4 Farms and W4 Poultry are agribusinesses engaged in integrated farming and poultry cultivation. (Second Am. Compl. ¶ 8.) W4 Farms and W4 Poultry are owned and operated by the White family, which includes but is not limited to Joey White, C.L. White, Terry White, Clent White, and Brent White. (Second Am. Compl. ¶ 9.) Joey White is the president of W4 Farms and a member of W4 Poultry. (Second Am. Compl. ¶ 3.)

15. On August 31, 2010, Plaintiffs and Tyson Farms entered into the Broiler Production Contract. (Second Am. Compl. ¶ 10; Mem. Supp. Defs.' Partial Mot. Dismiss Pls.' Second Am. Compl. Ex. A [hereinafter Broiler Production Contract].) Pursuant to the Broiler Production Contract, Tyson Farms, as "Company," and Plaintiffs, as "Producer," had the following respective obligations:

2. Duties of Company.

A. Company will furnish Producer with and will retain title and ownership to chickens, feed, and medication. Company will determine the amount, type, frequency, and time of delivery to and pick-up from Producer of chickens, feed, and medication.

B. Company will provide veterinary services and technical advice to assist Producer's production of Broilers.

3. Duties of Producer.

A. Producer will furnish labor, materials, and utilities necessary for the receipt of chickens and the production of Broilers and will when appropriate seek Company's technical advice.

B. Producer will maintain biosecure housing for Company's chickens, feed, and medication, and will promote a disease-free environment.

C. Producer will implement Company's recommended best animal management practices, including recommendations regarding lighting, brooding, watering, ventilation, and bedding.

(Broiler Production Contract ¶¶ 2–3.) Additionally, the Broiler Production Contract set forth detailed requirements for the broiler houses and the farm site on which such houses were to be built. (Broiler Production Contract Schedule B.) Moreover, the Broiler Production Contract contained a best efforts clause (the "Best Efforts Clause"), which provided that "Company and Producer will use their reasonable best efforts in the production of Broilers." (Broiler Production Contract ¶ 4.)

16. Plaintiffs' compensation under the Broiler Production Contract was based on the net pound value of their Broiler flock as compared to that of other producers whose chickens were transported for slaughter at the same complex. (Broiler Production Contract Schedule A.) Plaintiffs' net pound value was calculated based on the value of the chicks and feed provided to Plaintiffs, on the one hand, and the weight of Plaintiffs' Broiler flock minus farm-caused condemnation chargeable to

producer ("FCCP"), on the other hand.  (Broiler Production Contract Schedule A, ¶¶ A, C–E.)  The Broiler Production Contract defined FCCP as whole chickens condemned due to tuberculosis, leukosis, septicemia, toxemia, synovitis, tumors, airsacculitis, and inflammatory process.  (Broiler Production Contract Schedule A, ¶ B.)  The average net pound value of all producers at the same complex as Plaintiffs was calculated in the same manner and then adjusted by removing producers whose net pound value was 2.5 cents greater or less than the average net pound value (the "Adjusted Average").  (Broiler Production Contract Schedule A, ¶¶ D, F.)  If Plaintiffs' net pound value was equal to the Adjusted Average, then Plaintiffs were to receive the base pay of 4.97 cents per net pound.  (Broiler Production Contract Schedule A, ¶ G.)  For each 0.01 cent per net pound that Plaintiffs' net pound value was less than the Adjusted Average, Plaintiffs were to receive 0.01 cent more per net pound than the base pay.  (Broiler Production Contract Schedule A, ¶ G.)  For each 0.01 cent per net pound that Plaintiffs' net pound value was greater than the Adjusted Average, Plaintiffs were to receive 0.01 cent less per net pound than the base pay, but no less than 3.22 cents per net pound.  (Broiler Production Contract Schedule A, ¶ G.)

17.    The Broiler Production Contract contained a disclaimer provision that stated, in all capital letters, "Company does not warrant quality, merchantability, or fitness for purpose of, or otherwise warrant, any property or product (not manufactured or produced by Company) delivered or recommended by Company to Producer."  (Broiler Production Contract ¶ 7.)

18. Additionally, the Broiler Production Contract contained a merger clause that provided "[t]his Contract, including the attached Schedules, contains the entire agreement between Producer and Company regarding the production of Broilers. This Contract supersedes all prior agreements between Producer and Company." (Broiler Production Contract ¶ 12.)

19. The Broiler Production Contract was to expire on August 31, 2025, unless terminated earlier by either Plaintiffs or Tyson Farms. (Broiler Production Contract ¶ 10.)

20. After entering into the Broiler Production Contract, Plaintiffs subsequently contracted for the construction of eight broiler houses, which were specially built to Tyson Farms's housing specifications. (Second Am. Compl. ¶ 12.)

21. Plaintiffs allege that on numerous occasions beginning on August 31, 2010 and continuing through February 19, 2016, Defendants knowingly supplied Plaintiffs with Broilers that had a genetic defect, which made the Broilers highly susceptible to various diseases manifesting in the free thoracic vertebrae, including but not limited to osteochondrosis dessicans ("OCD"), enteroccocal cecorum ("EC"), pathogenic EC ("PEC"), enteroccocal spondylitis ("ES"), and kinkyback disease. (*E.g.*, Second Am. Compl. ¶¶ 30, 45a−uu, 53−58, 67.) Plaintiffs allege that Defendants knew that the genetic defect and resulting disease would cause, and did in fact cause, Plaintiffs to sustain significant Broiler deaths. (*E.g.*, Second Am. Compl. ¶¶ 45jj, 45oo, 48aa−bb, 48dd, 53i, 53m.) Plaintiffs contend that the high incidence of mortalities impacted their net pound values under the Broiler Production Contract and their compensation

based thereon, and that Defendants improperly charged all culls resulting from the defect against Plaintiffs as FCCP. (*E.g.*, Second Am. Compl. ¶¶ 45oo–qq, 45vv, 48ii–jj, 48ll, 53u–x, 53aa–bb, 53xx.) Plaintiffs allege that Defendants misrepresented and/or concealed from Plaintiffs the existence of the genetic defect and the diseases and death losses that such defect would directly cause. (*E.g.*, Second Am. Compl. ¶¶ 53–59.) Plaintiffs further contend that Defendants provided inadequate and false technical advice to Plaintiffs, and that Defendants disseminated remediation practices regarding prevention of disease caused by the genetic defect despite knowing that there was nothing Plaintiffs could do to prevent or cure such disease. (*E.g.*, Second Am. Compl. ¶¶ 40, 45tt, 48ee–ff, 53gg–ii, 53ll.)

22. On February 19, 2016 at 1:00 p.m., a catch crew arrived on Plaintiffs' property to collect market-weight Broilers in broiler house 1. (Second Am. Compl. ¶ 14.) Plaintiffs contend that catch crew members repeatedly overlooked and failed to collect market-weight Broilers. (Second Am. Compl. ¶ 15.) Plaintiffs allege that when they informed the catch crew that market-weight Broilers had been overlooked, a catch crew member picked up two market-weight Broilers and spiked them down into the ground. (Second Am. Compl. ¶ 16.) This caused a verbal disagreement between the catch crew member and Clent White, which lasted a few seconds. (Second Am. Compl. ¶¶ 16–17.)

23. Plaintiffs allege that the foreman of the catch crew and other members assured Plaintiffs that, despite this incident, all market-weight Broilers would be picked up. (Second Am. Compl. ¶ 18.) Plaintiffs contend that despite these

assurances, the catch crew prepared to leave without collecting all market-weight Broilers. (Second Am. Compl. ¶ 18.) At this time, another verbal dispute arose between Clent White and a member of the catch crew regarding the crew's failure to pick up market-weight Broilers. (Second Am. Compl. ¶ 18.) The catch crew left Plaintiffs' property around 5:30 p.m. (Second Am. Compl. ¶ 19.)

24. Hours after the catch crew left, Alan Pace, Defendants' Live Production Manager, Michael Todd, Defendants' Production Manager, and Rodney Eller, Defendants' Broiler Grow Out Manager, arrived on Plaintiffs' property and accompanied Joey White and C.L. White to broiler house 1. (Second Am. Compl. ¶¶ 20−21.) Plaintiffs allege that Defendants' managers agreed that the catch crew left numerous market-weight Broilers that were required to be collected and weighed for compensation. (Second Am. Compl. ¶ 21.) Plaintiffs allege that Defendants' managers advised Plaintiffs that the issue would be handled. (Second Am. Compl. ¶ 21.) Thereafter, Plaintiffs euthanized all culled Broilers in broiler house 1 and prepared for Defendants' next flock delivery. (Second Am. Compl. ¶ 23.)

25. At some time after February 19, 2016 and prior to February 25, 2016, Joey White received a telephone call from Alan Pace indicating that Defendants were terminating the Broiler Production Contract. (Second Am. Compl. ¶ 24.) On or about February 25, 2016, Alan Pace mailed a letter to Joey White confirming that Defendants were terminating the Broiler Production Contract. (Second Am. Compl. ¶ 25.) Plaintiffs allege that Tyson Farms determined that Plaintiffs were in contractual default due to allegations of abusive and threatening language

communicated to the catch crew. (Second Am. Compl. ¶¶ 25–26.) Plaintiffs contend that the allegations of abusive and threatening language are false and that Defendants thus improperly terminated the Broiler Production Contract. (Second Am. Compl. ¶¶ 25, 27.)

26. Plaintiffs assert the following claims against Defendants: (1) breach of contract, (Second Am. Compl. 12), (2) breach of the implied covenant of good faith and fair dealing, (Second Am. Compl. 15), (3) unfair and deceptive trade practices ("UDTP"), (Second Am. Compl. 21), (4) fraud, (Second Am. Compl. 31), (5) fraud in the inducement, (Second Am. Compl. 80), (6) negligent misrepresentation, (Second Am. Compl. 90), and (7) negligence, (Second Am. Compl. 98). Plaintiffs also seek to hold Tyson Foods liable for each cause of action asserted against Tyson Farms under the doctrine of piercing the corporate veil, contending that Tyson Farms is a mere instrumentality or alter ego of Tyson Foods. (Second Am. Compl. 93.) Plaintiffs further seek to hold Defendants vicariously liable for the conduct of Defendants' individual agents. (Second Am. Compl. 96.) Although not asserted as a stand-alone claim, Plaintiffs assert that they are entitled to punitive damages.

27. The Motion seeks to dismiss a portion of Plaintiffs' claims for breach of contract and breach of the implied covenant of good faith and fair dealing, and to dismiss the entirety of Plaintiffs' claims for UDTP, fraud, fraud in the inducement, negligent misrepresentation, vicarious liability, negligence, and punitive damages.

## IV.    LEGAL STANDARD

28.    In ruling on a motion to dismiss pursuant to Rule 12(b)(6) of the North Carolina Rules of Civil Procedure, the Court reviews the allegations of the Second Amended Complaint in the light most favorable to Plaintiffs.  The Court's inquiry is "whether, as a matter of law, the allegations of the complaint, treated as true, are sufficient to state a claim upon which relief may be granted under some legal theory." *Harris v. NCNB Nat'l Bank of N.C.*, 85 N.C. App. 669, 670, 355 S.E.2d 838, 840 (1987). The Court construes the Second Amended Complaint liberally and accepts all allegations as true.  *Laster v. Francis*, 199 N.C. App. 572, 577, 681 S.E.2d 858, 862 (2009).  However, the Court is not required "to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *Good Hope Hosp., Inc. v. N.C. Dep't of Health & Human Servs.*, 174 N.C. App. 266, 274, 620 S.E.2d 873, 880 (2005).  A "trial court can reject allegations that are contradicted by the documents attached, specifically referred to, or incorporated by reference in the complaint."  *Laster*, 199 N.C. App. at 577, 681 S.E.2d at 862.  The Court can also ignore a party's legal conclusions set forth in its pleading.  *McCrann v. Pinehurst, LLC*, 225 N.C. App. 368, 377, 737 S.E.2d 771, 777 (2013).

29.    Dismissal of a claim pursuant to Rule 12(b)(6) is proper "(1) when the complaint on its face reveals that no law supports [the] claim; (2) when the complaint reveals on its face the absence of fact sufficient to make a good claim; [or] (3) when some fact disclosed in the complaint necessarily defeats the . . . claim."  *Oates v. JAG, Inc.*, 314 N.C. 276, 278, 333 S.E.2d 222, 224 (1985); *see also Jackson v. Bumgardner*,

318 N.C. 172, 175, 347 S.E.2d 743, 745 (1986). Otherwise, "a complaint should not be dismissed for insufficiency unless it appears to a certainty that plaintiff is entitled to no relief under any state of facts which could be proved in support of the claim." *Sutton v. Duke*, 277 N.C. 94, 103, 176 S.E.2d 161, 166 (1970) (emphasis omitted).

## V.   ANALYSIS

### A.   Breach of Contract and Breach of Implied Covenant of Good Faith and Fair Dealing (Counts I and II)

30.   The Motion seeks dismissal of the portion of Plaintiffs' claims for breach of contract and breach of the implied covenant of good faith and fair dealing that are based on allegations that Defendants supplied Plaintiffs with genetically defective Broilers that were inherently susceptible to disease and resulting death (the "Quality Allegations"). (Mem. Supp. Defs.' Partial Mot. Dismiss Pls.' Second Am. Compl. 12, 15−18.) In support of the Motion, Defendants argue that the express terms of the Broiler Production Contract, specifically the disclaimer provision, unambiguously disclose that there is no enforceable agreement between the parties as to the quality of Broilers supplied by Defendants to Plaintiffs. (Mem. Supp. Defs.' Partial Mot. Dismiss 15−18.)

31.   "Interpreting a contract requires the court to examine the language of the contract itself for indications of the parties' intent at the moment of execution." *State v. Philip Morris USA Inc.*, 359 N.C. 763, 773, 618 S.E.2d 219, 225 (2005). The contract is to be construed consistently with reason and common sense. *Variety Wholesalers, Inc. v. Salem Logistics Traffic Servs., LLC*, 365 N.C. 520, 525, 723 S.E.2d 744, 748 (2012). When a contract is plain and unambiguous, the Court can determine the

parties' intent as a matter of law. *42 E., LLC v. D.R. Horton, Inc.*, 218 N.C. App. 503, 513, 722 S.E.2d 1, 8 (2012). If a contract is ambiguous, however, interpretation of the contract is a question of fact for the jury. *Variety Wholesalers, Inc.*, 365 N.C. at 525, 723 S.E.2d at 748. An ambiguity exists when the effect of provisions is uncertain or capable of several reasonable interpretations. *Id.*

32. The disclaimer provision states that Defendants do not warrant the quality of "any property or product *(not manufactured or produced by [Defendants])* delivered or recommended by" Defendants to Plaintiffs. (Broiler Production Contract ¶ 7 (emphasis added).) Defendants argue that the Broilers are property, rather than product, and that the parenthetical "not manufactured or produced by [Defendants]" only modifies product. Accordingly, Defendants argue that the contract disclaims any representations that pertain to the quality of Broilers delivered by Defendants to Plaintiffs, regardless of whether the Broilers were manufactured or produced by Defendants.

33. This argument is unavailing. The Court concludes that the parenthetical in the disclaimer provision can just as reasonably be interpreted as modifying both property and product, as opposed to only property, as Defendants contend. As such, the Court cannot conclude, as a matter of law, that the disclaimer provision unambiguously disclaims any representations or warranties made by Defendants, or precludes any agreement between Plaintiffs and Defendants, as to the quality of Broilers supplied by Defendants to Plaintiffs.

34.   The Broiler Production Contract required Defendants to furnish Plaintiffs with Broilers and to provide technical advice to assist Plaintiffs' production of Broilers.  (Broiler Production Contract ¶ 2.A−B.)  The Best Efforts Clause further provided that Defendants would "use their reasonable best efforts in the production of Broilers."  (Broiler Production Contract ¶ 4.)  Construing the Broiler Production Contract as a whole—specifically, Defendants' obligations to provide Broilers to Plaintiffs and to use their reasonable best efforts in the production of Broilers—the Court concludes that Plaintiffs' allegations that Defendants provided false technical advice to Plaintiffs and supplied Plaintiffs with genetically defective Broilers that were inherently susceptible to fatal disease are sufficient, at the Rule 12(b)(6) stage, to state a claim that Defendants breached the Broiler Production Contract.  *See 42 E., LLC*, 218 N.C. App. at 513, 722 S.E.2d at 8 ("Since the object of construction is to ascertain the intent of the parties, the contract must be considered as an entirety. The problem is not what the separate parts mean, but what the contract means when considered as a whole." (quoting *Jones v. Casstevens*, 222 N.C. 411, 413−14, 23 S.E.2d 303, 305 (1942))).  Therefore, the Motion as to Plaintiffs' claims for breach of contract and breach of the implied covenant of good faith and fair dealing based on the Quality Allegations is denied.

### B.   Fraud and Fraud in the Inducement (Counts IV and V)

35.   Plaintiffs bring claims for fraud and fraud in the inducement based on theories of both fraudulent misrepresentation and fraudulent concealment.  However, the majority of Plaintiffs' allegations assert fraud by concealment, and the Motion

seeks dismissal of Plaintiffs' fraud claims on the ground that the allegations of fraudulent concealment are insufficient to satisfy the particularity requirement of Rule 9(b). (Mem. Supp. Defs.' Partial Mot. Dismiss 25–26.) Accordingly, the Court only discusses whether the allegations are sufficient to state a claim for fraudulent concealment.

36. In order to state a claim for fraud or fraud in the inducement, Plaintiffs must allege a "(1) [f]alse representation or concealment of a material fact, (2) reasonably calculated to deceive, (3) made with intent to deceive, (4) which does in fact deceive, (5) resulting in damage to the injured party." *Forbis v. Neal*, 361 N.C. 519, 526–27, 649 S.E.2d 382, 387 (2007) (quoting *Ragsdale v. Kennedy*, 286 N.C. 130, 138, 209 S.E.2d 494, 500 (1974)); *Tradewinds Airlines, Inc. v. C-S Aviation Servs.*, 222 N.C. App. 834, 840, 733 S.E.2d 162, 168 (2012). Pursuant to Rule 9(b), all allegations of fraud must be pleaded with particularity. N.C. Gen. Stat. § 1A-1, Rule 9(b); *Terry v. Terry*, 302 N.C. 77, 84–85, 273 S.E.2d 674, 678 (1981). When alleging fraud by concealment, the particularity requirement is met by alleging

> (1) the relationship [between plaintiff and defendant] giving rise to the duty to speak; (2) the event or events triggering the duty to speak and/or the general time period over which the relationship arose and the fraudulent conduct occurred; (3) the general content of the information that was withheld and the reason for its materiality; (4) the identity of those under a duty who failed to make such disclosures; (5) what [the defendant] gained by withholding information; (6) why plaintiff's reliance on the omission was both reasonable and detrimental; and (7) the damages proximately flowing from such reliance.

*Lawrence v. UMLIC-Five Corp.*, 2007 NCBC LEXIS 20, at *9–10 (N.C. Super. Ct. June 18, 2007) (alterations in original) (quoting and adopting *Breeden v. Richmond Cmty. Coll.*, 171 F.R.D. 189, 195–96 (M.D.N.C. 1997)).

37. Plaintiffs' fraud allegations are extensive and repetitive. (*See, e.g.*, Second Am. Compl. ¶¶ 53–67.) In essence, however, Plaintiffs allege that Defendants supplied Plaintiffs with Broilers that "were known to be genetically defective and/or genetically faulty, having a spinal lesion and/or possessing an inherent susceptibility for lesion development in the spinal column[.]" (Second Am. Compl. ¶¶ 53a, 54a, 55a, 56a, 57a, 58a, 67a.) Plaintiffs contend that Defendants supplied Plaintiffs with Broilers that "were genetically modified, bred, crossbred, developed and/or selectively grown to drastically weigh more and/or sustain excessive weight on their skeletal frames, which exacerbated, aggravated and/or worsened OCD levels, lesions and/or vertebral defects, and broiler contraction of ES and/or 'kinkyback' disease[.]" (Second Am. Compl. ¶¶ 53r, 54r, 55r, 56r, 57r, 58r, 67r.) Plaintiffs allege that Defendants concealed from Plaintiffs the existence and origin of the defect, the disease contraction caused by the defect, and the significant death losses that would result. (*E.g.*, Second Am. Compl. ¶¶ 53ll, 53pp, 53uu, 67ll, 67pp, 67uu.)

38. Defendants first argue that the allegations are insufficient as to the materiality of the concealed information. (Mem. Supp. Defs.' Partial Mot. Dismiss 25.) The Court disagrees with Defendants. "A fact is material 'if the fact untruly asserted or wrongfully suppressed, if it had been known to the party, would have influenced [its] judgment or decision in making the contract at all.'" *Godfrey v. Res-*

*Care, Inc.*, 165 N.C. App. 68, 75–76, 598 S.E.2d 396, 402 (2004) (alteration in original) (quoting *Machine Co. v. Bullock*, 161 N.C. 1, 7, 76 S.E. 634, 636 (1912)). Plaintiffs allege that they entered into the Broiler Production Contract and incurred substantial debt and infrastructure obligations in the absence of the information concealed by Defendants—that is, the existence of the genetic defect and resulting disease contraction and death. (Second Am. Compl. ¶¶ 48b, 71.) The Court concludes that these allegations are sufficient to allege why the concealed information was material.

39.    Defendants next argue that the allegations are insufficient as to what Defendants gained by concealing the information. Defendants argue that they had nothing to gain from supplying and culling sick Broilers because Defendants owned the chickens and invested in their feed, medication, and veterinary services. (Mem. Supp. Defs.' Partial Mot. Dismiss 25–26.) Plaintiffs allege, however, that Defendants put their own financial interests ahead of broiler viability and made a business decision to genetically modify and breed Broilers to attain excessive weight at rapid growth rates, which resulted in Defendants' pecuniary gain while exacerbating disease contraction and death losses at Plaintiffs' expense. (*E.g.*, Second Am. Compl. ¶¶ 53u–v, 53pp–qq, 53ww, 62, 64, 67u–v, 67pp–qq, 67ww.) Moreover, Plaintiffs allege that Defendants' concealments enabled Defendants to charge all culls due to the defect-induced disease against Plaintiffs as FCCP. (*E.g.*, Second Am. Comp. ¶¶ 53w–x, 53aa–bb, 53mm, 53tt, 53xx, 67w–x, 67aa–bb, 67mm, 67tt, 67xx.) Taking these allegations as true, as the Court must at this stage, the Court concludes that

Plaintiffs have sufficiently alleged what Defendants gained by concealing the genetic defect.

40. Additionally, Defendants argue that Plaintiffs' fraud claims must be dismissed because Plaintiffs fail to allege that they reasonably relied on Defendants' omissions, and any allegations of reliance contradict the express disclaimer in the Broiler Production Contract. (Mem. Supp. Defs.' Partial Mot. Dismiss 27–29.)

41. As discussed above, the disclaimer provision does not unambiguously disclaim all representations regarding the quality of Broilers to be supplied by Defendants to Plaintiffs. Further, our appellate courts have stated that "reasonable" reliance "is most succinctly defined in the negative: '[r]eliance is not reasonable where the plaintiff could have discovered the truth of the matter through reasonable diligence, but failed to investigate.'" *Bumpers v. Cmty. Bank of N. Va.*, 367 N.C. 81, 90, 747 S.E.2d 220, 227 (2013) (quoting *Sullivan v. Mebane Packaging Grp., Inc.*, 158 N.C. App. 19, 26, 581 S.E.2d 452, 458 (2003)); *see also Everts v. Parkinson*, 147 N.C. App. 315, 326, 555 S.E.2d 667, 675 (2001) (citing and discussing *Rosenthal v. Perkins*, 42 N.C. App. 449, 257 S.E.2d 63 (1979)); *Hudson-Cole Dev. Corp. v. Beemer*, 132 N.C. App. 341, 346, 511 S.E.2d 309, 313 (1999) ("[W]hen the party relying on the false or misleading representation could have discovered the truth upon inquiry, the complaint must allege that he was denied the opportunity to investigate or that he could not have learned the true facts by the exercise of reasonable diligence.").

42. Here, Plaintiffs allege that they relied on Defendants' omissions and the health of the Broilers supplied by Defendants to Plaintiffs. (Second Am. Compl. ¶¶

59, 63, 73.) Plaintiffs further allege that they could not have learned of the existence of the genetic defect or the genetic basis for disease contraction—which are, by their very nature, inconspicuous and imperceptible—through the exercise of reasonable diligence. (Second Am. Compl. ¶¶ 59, 63, 73.) Plaintiffs allege that the defect-induced disease manifested gradually and was difficult to identify and cull. (*E.g.*, Second Am. Compl. ¶ 53m.) Plaintiffs contend that, as a result, they suffered decreased net pound values, charges against the farm, decreased compensation, and devaluation of property. (Second Am. Compl. ¶¶ 64, 74.) These allegations are sufficient to plead reasonable and detrimental reliance.

43. Therefore, the Court concludes that the allegations of the Second Amended Complaint are sufficient, at the Rule 12(b)(6) stage, to state claims for fraud and fraud in the inducement. As such, the Motion as to these claims is denied.

## C. Negligent Misrepresentation and Negligence (Counts VI and IX)

44. As noted above, the Motion relates to Plaintiffs' Second Amended Complaint. Plaintiffs have filed a motion seeking leave to file a third amended complaint. In their proposed third amended complaint, Plaintiffs do not assert a negligent misrepresentation claim and, during the hearing on the Motion, Plaintiffs stipulated that such claim in the Second Amended Complaint should be dismissed. Thus, the Motion as to Plaintiffs' negligent misrepresentation claim is granted.

45. Defendants argue that Plaintiffs' negligence claim is barred by the economic loss rule. The economic loss rule prohibits recovery in tort for purely

economic loss arising out of a breach of contract. *Rountree v. Chowan Cty.*, 796 S.E.2d 827, 830−31 (N.C. Ct. App. 2017). As recently stated by our Court of Appeals,

> [a] tort action does not lie against a party to a contract who simply fails to properly perform the terms of the contract, even if that failure to perform was due to the negligent or intentional conduct of that party, when the injury resulting from the breach is damage to the subject matter of the contract. It is the law of contract and not the law of negligence which defines the obligations and remedies of the parties in such a situation.

*Id.* (quoting *Lord v. Customized Consulting Specialty, Inc.*, 182 N.C. App. 635, 639, 643 S.E.2d 28, 30−31 (2007)). "[I]n order to maintain tort claims for conduct also alleged to be a breach of contract, a plaintiff must identify a duty owed by the defendant separate and distinct from any duty owed under a contract." *Forest2Market, Inc. v. Arcogent, Inc.*, 2016 NCBC LEXIS 3, at *8 (N.C. Super. Ct. Jan. 5, 2016) (quotation marks omitted); *see also Rountree*, 796 S.E.2d at 831 ("[A] viable tort action must be grounded on a violation of a *duty* imposed by operation of law, and the right invaded must be one that the law provides without regard to the contractual relationship of the parties." (quotation marks omitted)).

46. Here, Plaintiffs allege that Defendants

> owed a legal duty to Plaintiffs to abide by all terms and provisions of the broiler production contract and to fulfill and perform all obligations enumerated in the agreement. Furthermore, Defendants . . . had a legal duty to exercise good faith when working with Plaintiffs and to also deal fairly with Plaintiffs in the furtherance of the broiler production contract.

(Second Am. Compl. ¶ 94.) Plaintiffs contend that Defendants breached these duties by using a catch crew that was known to be vexatious, failing to conduct proper investigations into Plaintiffs' alleged default under the Broiler Production Contract,

disseminating inaccurate information about the circumstances surrounding Plaintiffs' alleged default, and improperly terminating the contract. (Second Am. Compl. ¶ 95.)

47. Plaintiffs' negligence claim plainly alleges that Defendants have failed to properly perform under the Broiler Production Contract—the quintessential tort claim that the economic loss rule is intended to preclude. The Second Amended Complaint is devoid of any factual allegations that Defendants owed Plaintiffs a legal duty independent of the Broiler Production Contract. Therefore, unless an exception applies, the economic loss rule bars Plaintiffs' negligence claim.

48. Our Supreme Court has articulated four exceptions to the economic loss rule:

> (1) The injury, proximately caused by the promisor's negligent act or omission in the performance of his contract, was an injury to the person or property of someone other than the promisee.
>
> (2) The injury, proximately caused by the promisor's negligent, or wilful, act or omission in the performance of his contract, was to property of the promisee other than the property which was the subject of the contract, or was a personal injury to the promisee.
>
> (3) The injury, proximately caused by the promisor's negligent, or wilful, act or omission in the performance of his contract, was loss of or damage to the promisee's property, which was the subject of the contract, the promisor being charged by law, as a matter of public policy, with the duty to use care in the safeguarding of the property from harm, as in the case of a common carrier, an innkeeper or other bailee.
>
> (4) The injury so caused was a wilful injury to or a conversion of the property of the promisee, which was the subject of the contract, by the promisor.

*N.C. State Ports Auth. v. Lloyd A. Fry Roofing Co.*, 294 N.C. 73, 82, 240 S.E.2d 345, 350–51 (1978) (citations omitted). Plaintiffs argue that the fourth exception applies because their farm has been devalued due to Defendants' willful injury. (Br. Supp. Pls.' Resp. Opp'n Defs.' Mot. Dismiss 27–28.)

49. "Willful injury constitutes actual knowledge of the danger combined with a design, purpose, or intent to do wrong and inflict injury." *Nelson v. Freeland*, 349 N.C. 615, 618, 507 S.E.2d 882, 884 (1998). The Court is not convinced that property devaluation is "injury" to property for purposes of the exceptions to the economic loss rule. Nevertheless, assuming *arguendo* that the alleged devaluation to the farm constitutes the requisite injury to property for purposes of the fourth *Ports Authority* exception, the Second Amended Complaint does not contain any factual allegations as to Defendants' actual knowledge of the danger to Plaintiffs' property or as to Defendants' design, purpose, or intent. The Second Amended Complaint merely alleges that Defendants "willfully" and improperly terminated the Broiler Production Contract. Such a conclusory allegation, without more, is insufficient to support application of the fourth *Ports Authority* exception to the economic loss rule.

50. Therefore, the Court concludes that Plaintiffs' negligence claim is barred by the economic loss rule. As such, the Motion as to Plaintiffs' negligence claim is granted.

### D. UDTP (Count III)

51. Fraud in the inducement necessarily constitutes an unfair and deceptive trade practice. *Tradewinds Airlines, Inc.*, 222 N.C. App. at 840, 733 S.E.2d at 169.

Further, during the hearing on the Motion, Defendants stipulated that if Plaintiffs' fraud claims survive, then Plaintiffs' UDTP claim survives. As the Court has concluded that Plaintiffs' allegations are sufficient to state claims for fraud and fraud in the inducement, the allegations are likewise sufficient, at the Rule 12(b)(6) stage, to state a UDTP claim. Therefore, the Motion as to this claim is denied.

### E.   Vicarious Liability (Count VIII)

52.   In general, a principal will be liable for the wrongful acts of its agent "when the agent's act (1) is expressly authorized by the principal; [or] (2) is committed within the scope of the agent's employment and in furtherance of the principal's business; or (3) is ratified by the principal." *White v. Consol. Planning, Inc.*, 166 N.C. App. 283, 296, 603 S.E.2d 147, 157 (2004). Further, "a principal is responsible to third parties for the fraud of its agent while acting within his authority." *Id.* at 297, 603 S.E.2d at 157.

53.   The Court has concluded that the allegations are sufficient to state claims for fraud and fraud in the inducement. Plaintiffs contend that the fraud was committed by specific employees and agents of Defendants at Defendants' direction and within the scope of the individuals' employment. (Second Am. Compl. ¶¶ 5, 32, 53ll–mm, 89.) Therefore, the Court concludes that the allegations of the Second Amended Complaint are sufficient, at the Rule 12(b)(6) stage, to state a vicarious liability claim. As such, the Motion as to this claim is denied.

**F.    Punitive Damages**

54.    Pursuant to N.C. Gen. Stat. § 1D-15(a), punitive damages may be awarded only if the claimant proves that the defendant is liable for compensatory damages and that either fraud, malice, or willful or wanton conduct was present and related to the injury for which compensatory damages were awarded.  N.C. Gen. Stat. § 1D-15(a).  Punitive damages are available for a successful fraud claim.  *Sparrow Sys., Inc. v. Private Diagnostic Clinic, PLLC*, 2014 NCBC LEXIS 70, at *49 (N.C. Super. Ct. Dec. 24, 2014).  As the Court has concluded that the allegations are sufficient to state claims for fraud and fraud in the inducement, the Court likewise concludes that the allegations are sufficient, at the Rule 12(b)(6) stage, to state a claim for punitive damages.  *See id.* at *50 (denying defendant's Rule 12(b)(6) motion to dismiss plaintiff's punitive damages claim because plaintiff sufficiently alleged a claim for fraud).  Therefore, the Motion as to this claim is denied.

## VI.    CONCLUSION

55.    For the foregoing reasons, the Court hereby **GRANTS in part** and **DENIES in part** the Motion as follows:

    A.    The Court **GRANTS** the Motion as to Plaintiffs' claims for negligent misrepresentation and negligence and dismisses those claims with prejudice.

    B.    The Court **DENIES** the Motion as to Plaintiffs' claims for breach of contract, breach of the implied covenant of good faith and fair

dealing, fraud, fraud in the inducement, UDTP, vicarious liability, and punitive damages.

**SO ORDERED**, this the 24th day of July, 2017.


/s/ Michael L. Robinson

Michael L. Robinson
Special Superior Court Judge
  for Complex Business Cases